**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

J.W. BAKER and LINDA L. BAKER                                    PLAINTIFFS

v.                                    No. 3:03CV00403 JLH

UNITED STATES OF AMERICA                                    DEFENDANT

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    This case arises under the Federal Tort Claims Act.  The case was tried to the Court from

November 14, 2005, through November 16, 2005.  Because the events in question occurred in

Tennessee, the parties stipulated that Tennessee law applies.  The parties also stipulated that the

plaintiffs had complied with the procedural prerequisites of 28 U.S.C. § 2675 so as to allow this

action to be initiated.

    Jerry Baker is a veteran.  He lives in Paragould, Arkansas.  On February 18, 2001, he was

admitted to the Veterans Administration Hospital in Memphis, Tennessee.  On February 21, 2001,

an MRI revealed a spinal epidural abscess at C-6-7.  Later that same day, a neurosurgeon performed

a total C-7 with partial C-6 laminectomy and removed the epidural abscess.  The spinal epidural

abscess caused Jerry Baker to be quadriparetic.  He has no movement of or feeling in his legs and

feet.  Over time, he has developed some movement in his arms.  He can grip with his left hand but

not with his right hand.  He alleges, first, that had the VA physicians exercised reasonable care the

spinal epidural abscess would have been discovered earlier, and, secondly, that had the spinal

epidural abscess been discovered earlier he would not have suffered the permanent quadriparesis

from which he now suffers.

    On these two issues – negligence and causation – Baker presented the testimony of four

expert witnesses: Robert J. Adams, M.D., Co-Director of the Cerebrovascular Section of the Department of Neurology at the Medical College of Georgia; Donald H. Marks, M.D., Ph.D., a medical consultant and physician who is board certified in internal medicine; Richard Terry Jackson, M.D., Vice-Chair for Clinical Programs at the University of Mississippi Medical Center; and Gerald Edward Rodts, Jr., M.D., Chief of Neurosurgery Service at the Emory Clinic and Professor of Neurology at the Emory University School of Medicine.  The United States presented the testimony of two expert witnesses: Stephen Winbery, M.D., who is board certified in internal medicine and has several years' experience in emergency medicine in Memphis; and Stephen T. Miller, M.D., Vice President for Medical Education at Methodist Healthcare in affiliation with the University of Tennessee Medical School.  In addition to the expert testimony, the defendant introduced by stipulation the following articles from medical journals: A.R. Mackenzie, *et al.*, *Spinal Epidural Abscess: The Importance of Early Diagnosis and Treatment*, 65 J. NEUROL. NEUROSURG. PSYCHIATRY 209-212 (1998); Daniele Rigamonti, *et al.*, *Spinal Epidural Abscess: Contemporary Trends in Etiology, Evaluation, and Management*, 52 SURG. NEUROL. 189-97 (1999); Martin Soehle and Thomas Wallenfang, *Spinal Epidural Abscesses: Clinical Manifestations, Prognostic Factors, and Outcomes*, 51 NEUROSURGERY 79-87 (2002); Daniel P. Davis, *et al.*, *The Clinical Presentation and Impact of Diagnostic Delays on Emergency Department Patients with Spinal Epidural Abscess*, 26 J. EMERGENCY MED. 285-91 (2004); Celestino Esteves Pereira and José′ Carlos Lynch, *Spinal Epidural Abscess: An Analysis of 24 Cases*, 63 SURGICAL NEUROLOGY S1:26-S1:29 (2004); Rohit K. Khanna, *et al.*, *Spinal Epidural Abscess: Evaluation of Factors Influencing Outcome*, 39 NEUROSURGERY 958-964 (1996); and K.M. Venkat Narayan, *et al.*, *Lifetime Risk for Diabetes*

*Mellitus in the United States*, 290 JAMA 1884-1890 (2003).[1]

A.      ***Spinal Epidural Abscess***

The spinal cord is the main neurological information pathway from the brain to the extremities.  Commands from the brain to the extremities travel through the spinal cord, as do signals from the extremities to the brain.  The spinal cord is located between the vertebra and the dura mater, which is the outermost and most fibrous of the three membranes that cover the brain and the spinal cord.  An abscess that forms on the dura mater may compress the spinal cord, which can result in neurological deficits below the point of compression.  All of the experts and all of the literature agree that a spinal epidural abscess is a medical emergency; it must be diagnosed as soon as possible and treated, almost always by surgery, as soon as possible.  Magnetic resonance imaging (MRI) is the gold standard for diagnosing spinal epidural abscess.

Spinal epidural abscess may be caused either by an infection from a direct intrusion into the spinal area, such as a spine surgery or spinal anesthesia; or it may be caused by an infection localized elsewhere in the body that spreads through the blood system before becoming situated on the dura mater.  *Staphylococcus aureus* is the predominant infectious agent.  Diabetes mellitus is one of the leading factors that predispose a person to the development of spinal epidural abscess.  In some studies, intravenous drug use is the leading predisposing factor, and diabetes mellitus is second.  In other studies, diabetes mellitus is the leading predisposing factor.

The classic signs and symptoms of spinal epidural abscess are fever or infection, spine pain, and neurological deficits.

Spinal epidural abscess is not common.  The overall frequency is reported to be between 0.2

---

[1] I will refer to these articles as the Rigamonti study, the Davis study, and so forth.

and 1.2 cases per 10,000 hospital admissions.  According to the Rigamonti study, from January 1, 1983, to December 31, 1992, 75 cases of spinal epidural abscess were identified at the University of Maryland Medical Systems.  During that same time, a total of 74,477 patients were admitted. Although spinal epidural abscess is uncommon, it is being diagnosed with greater frequency.

**B.**     *Jerry Baker*

Jerry was born on July 17, 1941.  As noted above, he is a veteran.  He served in Korea and in Vietnam.  In Vietnam, he worked in the Army Engineers building airstrips and the like.  He went to school through the seventh grade.  He obtained his GED while in the military.  After serving in the military, he became a bounty hunter for bail bondsmen.  In his testimony, he did not mention any work he has done other than his military service and his work in the bail bond business.

Jerry and Linda Baker have been married to each other twice.  They were married in 1983, divorced in 1992, and remarried in 1997.  Jerry Baker never had children.  Linda Baker had one son by a previous marriage.  That son died in 2001 from cancer.

Jerry Baker was diagnosed with diabetes in 1983.  He attributes his diabetes to exposure to Agent Orange in Vietnam in the mid-1960s.  Since 1983, he filed for disability with the Veterans Administration on several occasions due to his exposure to Agent Orange.  He was finally granted disability status, based on exposure to Agent Orange, after the events in question here.  As a result of the diabetes, he had amputation of the right second toe in 1987, a left transmetatarsal amputation in April 1999 with previous left great toe and left second toe amputations.  His last amputation was in 2000.  He also has had several skin cancers surgically removed.  When he was admitted to the VA Hospital on February 18, 2001, he reported that he had smoked approximately one and a half packs of cigarettes per day for 46 years.

4

C.    *Liability*

The law that governs liability in this case is stated in Tenn. Code Ann. §§ 29-26-115 *et seq.*
In deciding the liability issues, I have consulted and intend to follow the relevant portions of the
Tennessee Pattern Jury Instructions - Civil 6.10 *et seq.*, which are the Tennessee Pattern Jury
Instructions applicable to medical negligence cases.

Who prevails in this case depends on two issues: first, whether negligence by the VA
physicians caused a delay in the diagnosis of spinal epidural abscess from February 18, 2001, until
February 22, 2001; and, secondly, whether Jerry Baker's condition would be significantly better had
the spinal epidural abscess been diagnosed earlier.  The resolution of both issues depends on expert
testimony.  All of the expert witnesses who testified in this case are well qualified, highly educated,
articulate, competent, credible physicians with sufficient experience and expertise to opine as to the
standard of care under Tenn. Code Ann. § 29-26-115 and TPI-Civil 6.11; and they all have the
requisite expertise to opine on the causation issue.  All of them offered testimony that qualified as
expert testimony under Fed. R. Evid. 702.

The testimony of the experts called by the plaintiffs and by the defendants is in direct
contradiction on both of the ultimate dispositive issues.

Without disparaging any of the six physicians who testified as expert witnesses, I have
concluded that on the issue of negligence the most credible of the expert witnesses was Dr. Adams,
and on the issue of causation the most credible of the expert witnesses was Dr. Rodts.

Dr. Adams summarized the opinions that I am finding to be more likely than not true as
follows:

Q.  [H]ave you formed an opinion regarding whether the treatment that Mr. Baker

received at the VA Hospital in Memphis met the standard of care?

A.  Yes, I have.

Q.  And what is that opinion?

A.  I don't think it met the standard of care.

Q.  Have you formed an opinion regarding whether Mr. Baker's injuries were caused by that failure to meet the standard of care?

A.  Yes, I have.

Q.  And what is that opinion?

A.  I believe that they were.  I believe that his chances for a good outcome were compromised by the delayed diagnosis and treatment of the epidural abscess.

Q.  [D]o you have an opinion regarding whether Mr. Baker's injuries are permanent, and, if so, what is that opinion?

A.  I do, and I believe that they are permanent.

Dr. Adams testified more specifically as to whether the physicians at the VA Hospital met the standard of care at each stage during the course of Jerry Baker's hospitalization, and he stated the reasons for his opinion as to each stage.

First, Jerry Baker was seen by an emergency room physician at approximately 3:00 p.m. on February 18, 2001.  The emergency room physician reported that Jerry Baker had a chief complaint of weakness with increased temperature for several days and a history of diabetes.  The undisputed testimony established that Jerry Baker was able to walk with assistance at that time.  While waiting to be seen in the emergency room, Jerry Baker went into a public bathroom where he slid to the floor when he tried to stand, which he was unable to do.  According to the history taken in the emergency room, Jerry Baker had not felt well for three to four days.  He had had pain all over, but especially

neck pain.  He had had a high-grade fever, chills, and fatigue.  The emergency room record reports

that when examined there he had a temperature of 99.1 and a white blood count of 37,000, which

is a sign of an acute infection.  The emergency room physician concluded that Mr. Baker was acutely

ill, made a provisional diagnosis of sepsis, and admitted him into the hospital, whereupon the

responsibility for his case was assumed by a team of medicine physicians which consisted of a group

of residents under the supervision of an attending physician.

Dr. Adams does not believe that the standard of care was violated in the emergency room

because the emergency room physician recognized that Jerry Baker was acutely ill, admitted him to

the hospital, and moved him along into the hands of a definitive service for diagnosis and treatment.

Although other experts testified that the emergency room physician violated the standard of care, I

find that Dr. Adams's opinion on this issue is more likely than not true.

A physician from the medicine department first saw Jerry Baker at approximately 10:00 p.m.

on February 18.  That physician was a resident.  That resident reported the following history:

> Presented to ER with 1 week H/O feeling sick started with urinary ferquancy [sic],
> and burning with urine, associated with fever, chills, on and off, also complain of
> increased cough productive of yellow to green sputum, increased SOB, CP in the
> upper chest and bilateral shoulder, some MS changes per wife, "seems to be
> confused", decreased appetite, low po intake, sever [sic] HA and neck pain, no
> photophopia, + ve dizziness, no h/o black-outs, whoever [sic] wife not sure about the
> history, that pt was visiting with relativs [sic] when his health started to deteriorat
> [sic].  The Pt himself, is a poor historian.he [sic] said he thinks he had a strock [sic]
> while visiting out of town, wife also reported pus coming out of his penis that she
> noticed today.

The resident's examination showed temperature of 99.1, pulse of 100, respiration of 20, blood

pressure of 152/90.  The examination report noted that Jerry Baker was a white male in moderate

distress secondary to pain and discomfort.  His neck was stiff and tender.  The report of the

neurological exam performed by the resident stated, "no nystagmus, non focal decreased sensation in the LE." The resident's assessment of the neurological status of Mr. Baker was that he had mental status changes possibly secondary to sepsis or meningitis. She ordered a CT scan of the head to rule out meningitis. She also listed an intracranial bleed as a possible diagnosis.[2]

Dr. Adams opined that, given Mr. Baker's history and chief complaint of weakness, neck pain, stiff neck, tender neck, and history of fever, the resident's examination was not adequate and did not meet the standard of care. There was no recording of the extent of Jerry Baker's weakness in any extremity. There was no documented examination of the extent of Baker's weakness in either arm or either leg. The finding of "non focal decreased sensation" in the lower extremity was confused because decreased sensation in the legs is really a focal finding. The decreased sensation is not specified in any way that is helpful. An adequate sensory examination would have been a simple examination starting with a safety pin and pricking along the spine starting at the top of the neck and moving down to the buttocks toward the rectal area looking for change in what the patient tells you. Apparently, no such examination was performed. There was no motor examination, i.e., an examination that looks at the strengths of the muscles in the arms and legs. Dr. Adams's opinion that the neurological examination performed at approximately 10:00 p.m. on February 18 was inadequate for these reasons is confirmed by testimony from other expert witnesses. I find that Dr. Adams's opinion that this neurological examination failed to meet the standard of care is more likely than not true.

Dr. Adams testified that if an adequate examination had been done at 10:00 p.m. on

---

[2] I am not reiterating here portions of the hospital reports that do not directly pertain to the neurological and spinal cord issues.

February 18, it would have shown something that would have led the treating physicians to look at the spinal cord. It would have put in motion a process of investigation that would have rapidly discovered the spinal epidural abscess. The spinal epidural abscess then would have been treated as a medical emergency with urgent surgery. Dr. Adams's opinions on this point are confirmed by the opinions of other expert witnesses in this case. I find that these opinions are more likely than not true.

Jerry Baker was next examined just before midnight on February 18, this time by a different resident physician. This resident physician reported that Jerry Baker's chief complaints were weakness and increased frequency of urination. He recorded the following history:

> The patient complains of weakness and increased frequency of urination. The current problem was started about two weeks ago. Intensity of weakness has gradually increased. It was started with nocturia, about 3 to 4 times a night and continued. It is associated with feeling of pain in urination. It is associated with fever and chills, that started about 2 weeks ago and also with weight loss, claims last week his weight was 201 and now is 186, about 15 pounds weight loss during last week. It is associated with nausea, but no vomiting, is associated with decreased appetite. It is associated with cough. The cough problem has been ongoing for a long time and is related to his smoking but recently in the last week, the cough has increased and brings up sputum but does not know the color of sputum. It is associated with pain in his chest and pain in his neck and pain in both arms and some pain in lower extremities. It is associated with some neck pain. At beginning complained of headache but later denied pain in his head. Does not claim discomfort with light and does not complain of abdominal pain and no diarrhea and no constipation. He has an old problem of bifurcation of urine that has been ongoing for a long time.

The physical examination recorded that Jerry Baker had a "rigid neck." The neurological exam stated cranial nerve function 2 through 12 within normal limits, deep tendon reflexes are symmetric. The report of the examination also stated that Jerry Baker had pain in the neck with straight leg raising.

Dr. Adams testified that the neurological exam performed just before midnight on

February 18 did not meet the standard of care. There was no indication of Mr. Baker's mental state. There was no sensory examination. There was no indication that the spinal level was looked at for spinal sensory level. There was no examination of the extent of the weakness in any of the arms and legs. Dr. Adams also testified that had an adequate neurologic exam been performed it would have caused a spinal cord problem to be included prominently in the differential diagnosis. A differential diagnosis is a list of possible diagnoses that must be confirmed or ruled out. All of the expert witnesses testified that reasonable and ordinary care requires that potential diagnoses with the more catastrophic consequences be ruled out first. All of the expert witnesses testified that, if spinal epidural abscess is in the differential diagnosis, it must be treated as a medical emergency, and an MRI must be ordered to confirm or rule out the presence of a spinal epidural abscess. Dr. Adams testified that, if a spinal cord problem had been included prominently in the differential diagnosis, as it should have been, spinal epidural abscess would have been diagnosed shortly thereafter. I find that Dr. Adams's opinions regarding the examination shortly before midnight are more likely than not true.

Both of the residents who examined Jerry Baker included spinal meningitis in the differential diagnosis. It was reasonable to do so. A spinal tap was ordered. The spinal tap did not support meningitis.

Jerry Baker was next examined at 11:40 a.m. on February 19, 2001. This examination was performed by the attending physician. The attending physician noted as part of his examination:

> Neck stiff, but not rigid. Appears to be profoundly weak. Muscles flaccid and power of upper limbs 3/5 and lower limbs 1-2/5. No reflexes could be elicited. No tremor or fasciculations. Good resp effort and no cranial nerve involvement. Rt Babinski minimally responsive but downgoing.

* * *

> Imp.: Profound weakness associated with fever and high wbc suggestive of metabolic, toxic or paraneoplastic etiology.  Guillain-Barre is unlikely because of negative LP findings.  Usual metabolic suspects have been R/O.  Await 2nd line investigations inc. myositis work-up.  Will consider neuro consult if these are uninformative.  May need bx of renal lesion.

Dr. Adams opined that this examination was not adequate and did not meet the standard of care.  In the context of profound weakness, the report does not show a good examination that would lead someone to conclude whether Jerry Baker's neck pain, neck stiffness, weakness, and decreased sensation were caused by a cervical lesion of some kind involving all four extremities.  The neurological examination documented muscle weakness, which was worse in the legs than in the arms, but there was no sensory examination along the spine.  Dr. Adams opined that a physician exercising ordinary and reasonable care in the circumstances presented to the attending physician at 11:40 a.m. on February 19 would have targeted the cervical area of the spine as a possible cause of the myelopathy and as something that needed to be investigated urgently.  Dr. Adams's opinion is confirmed by that of other expert witnesses in the case.  I find that that opinion is more likely than not true.

Dr. Adams testified that the attending physician's impression that Jerry Baker's profound weakness associated with fever and high white blood count "suggestive of metabolic, toxic or paraneoplastic etiology" did not get at the real problem, which was the potential for a spinal cord problem.  Dr. Adams testified:

> It's not that this sort of a picture necessarily would lead someone to walk in and say, a-ha, this is a spinal epidural abscess.  But spinal cord problem should have been considered, compressive lesion should have been considered and in this febrile setting, with 37,000 white blood count and diabetic, this kind of history, it wouldn't have taken them long to get to an abscess as a diagnosis.  But none of that really is . . . necessary for this case to be diagnosed and treated properly.  It's simply an

examination that focuses in and raises this issue of a spinal cord problem and an appropriate test to rule out a compressive lesion.

By this time, Guillain-Barre was deemed unlikely, and cultures had been obtained that were inconsistent with meningitis. Jerry Baker had pain, tenderness, and stiffness of the neck with weakness in the arms and legs, but the physicians did not consider a compression of the spinal cord in the differential diagnosis. I find that the opinion stated by Dr. Adams is more likely than not true.

A resident again examined Jerry Baker shortly after the examination by the attending physician on February 19. The resident reported that Mr. Baker was "even more weak than yesterday all over, no muscle tenderness, but pain allover [sic]."

In the afternoon of February 19, the dietician reported, "Wants to feed self but unable due to weakness and loss of grip in hands. Now requiring full assistance with meals."

Jerry Baker was next examined at approximately 6:45 p.m. on February 19, again by a resident. The resident reported, "Complains of weakness. Feeling of nausea, pain all over his body. Asks for bathroom and I explained to him that [he] has a Foley cath[eter] and diaper." There is no account of why Mr. Baker had a diaper at this point. The only witness who addressed the issue was Dr. Adams, who stated that the presence of the diaper indicates that Jerry Baker must have lost bowel control at this point, which would be yet another indication of neurological failure. The resident's examination again reported a rigid neck and pain in the neck with straight leg raising. The neurological exam reported muscle force of I/V both sides, upper and lower extremities.

Again, this examination showed that Jerry Baker's strength continued to deteriorate. He continued to have a stiff or rigid neck. There was pain in the neck with straight leg raising. Yet, again, there was no consideration of a compressive lesion in the cervical area of the spine. Dr.

12

Adams opined that this examination failed to meet the standard of care. The testimony of other expert witnesses confirms his opinion. I find that this opinion is more likely than not true.

On February 20, 2001, Jerry Baker was transferred to the medical intensive care unit. He suffered respiratory arrest that day. At approximately 5:00 p.m. he was seen by a neurologist for the first time. The neurologist reported that Baker "says that he was unable to walk for the past 2-3 days." The neurologist concluded that they would need to rule out acute myelopathy or mass lesion. He ordered x-ray films of the entire spine looking for diffused metatastic disease and a CT scan of the cervico-thoracic spine to rule out a mass lesion. The CT scan showed paraspinal muscles posteriorly on the right, suggestive of cellulitis. At approximately 1:30 p.m. on February 21, a resident ordered an MRI of the cervical and thoracic spine. The MRI was performed approximately two hours later. It revealed an epidural abscess in the posterior canal from the C5 level inferiorly to C7-T1, mainly on the left side. The infection extended superiorly to about the C3 level. There was edema in the cord at the C5 level throughout the transverse section and involving the left half of the cord at the C6-7 level. The MRI report stated, "This is consistent with cord compression and probable acute infarction."

Dr. Rodts testified that, if Jerry Baker's spinal epidural abscess had been treated as a medical emergency and an MRI done on February 18, Jerry Baker would not have the paralysis he has today. He also testified that if Jerry Baker's spinal epidural abscess had been treated as a medical and surgical emergency on February 19 when the attending physician saw Jerry Baker, he would not have the paralysis that he has today. Dr. Rodts testified that, if the spinal epidural abscess had been diagnosed and treated on February 20, Mr. Baker still could have had some ambulation. Dr. Rodts's opinions are confirmed by the testimony of other expert witnesses in this case and by the medical

13

literature introduced into evidence.  Jerry Baker was able to walk with assistance on February 18.

He was profoundly weak on February 19 but still had neurological function in all extremities.  There

is no evidence that he had lost bowel control at that point.  It is probable that if the spinal epidural

abscess had been surgically drained while Jerry Baker still had that degree of function, he would

have retained or regained significantly greater use of his arms; he would have been able to walk; and

he now would have control of his bowels and bladder.

Drs. Winbery and Miller gave testimony that conflicts with my findings that the VA

physicians failed to exercise ordinary and reasonable care and with my findings that the failure to

exercise ordinary and reasonable care caused Jerry Baker's present quadriparesis.  They agreed with

one another and disagreed with the four expert witnesses called by the plaintiffs.  Dr. Miller stated

their position most succinctly when he characterized the testimony of plaintiffs' experts as based on

hindsight: after the fact, they know the correct answer (i.e., spinal epidural abscess), and they have

worked backward with that answer in mind rather than seeing the patient as he would have been seen

by the VA physicians on February 18, 19, and 20 of 2001 before anyone discovered the spinal

epidural abscess.  Drs. Miller and Winbery note that spinal epidural abscess is rare.  They note that

the medical literature shows that there is often a delay in the diagnosis of spinal epidural abscess.

They also note that the physicians who saw Jerry Baker were confronted with an array of

complicated signs and symptoms.  Dr. Miller characterized the signs and symptoms of epidural

abscess as "whispers of things" that were not heard because of the shouting of other things, including

the urinary tract symptoms, the urinary tract infection documented in the laboratory, suspicion that

this was urological sepsis, the diabetes with portions of the foot amputated and obvious potential

vascular complications, a CT scan that showed the possibility of pneumonia, and a cancer in the

kidney.  Dr. Miller notes that the CT scans of the head and the chest on February 18 and 19, although not ordered for the purpose of examining the spine, would have shown an abnormality of the spine with the portions of the spine that were scanned.   The cervical spine was not scanned until February 20.

These are all weighty considerations, and I have taken them seriously.  Despite my respect for Drs. Winbery and Miller and my appreciation for their sincerity and expertise, I have concluded that the opinions of the plaintiffs' experts are more likely true.  Although spinal epidural abscess is uncommon, every expert who testified in the case agreed that medical students are taught to diagnose it.  As noted above, the University of Maryland Hospital reported 75 patients with spinal epidural abscess in a period of ten years, which would be an average of seven or eight patients per year for one hospital in the United States.  The Davis study reported 74 patients with spinal epidural abscess in a period of ten years at a hospital in San Diego.  Spinal epidural abscess is uncommon, but it is not an exotic disease; it is not one of those diseases with only a handful of reported instances in the world.  It is not so rare as to be beyond diagnosis for a physician using ordinary and reasonable care in a tertiary care hospital in a city such as Memphis.  Although the literature shows that diagnosis of spinal epidural abscess is frequently delayed, a principal reason that the diagnosis is frequently delayed is that many patients with spinal epidural abscess do not present the "classic triad" of spine pain, fever, and neurologic deficits.  The Davis study reported that only 8% of the patients with spinal epidural abscess presented the "classic triad" on their initial visit and only 10% at admission. Definitive diagnosis must be made by an MRI or CT scan, but the Davis article reports that both may be difficult to obtain on an emergency basis.  No one testified that Jerry Baker's case failed to present any sign or symptom typical of spinal epidural abscess.  Jerry Baker presented with the

classic triad of spine pain, fever, and neurologic deficits. He also had diabetes mellitus, which is either the first or the second most common predisposing factor for spinal epidural abscess.[3] The VA physicians in Memphis had MRI and CT available on an emergency basis. Therefore, the reasons for delayed diagnosis as reported in the literature are not present here.

Dr. Miller's view was not that there was anything missing that should have put an ordinarily and reasonably careful doctor on notice that a spinal epidural abscess should be on the differential diagnosis. He testified that the presentation needed to be less complex. While it is true that the VA physicians were confronted with a lot of signs and symptoms, none of them pointed to a potential diagnosis that needed to be treated as a greater emergency than spinal cord compression. Furthermore, since spinal epidural abscess often involves an infection that spreads through the blood system to the dura mater (hence the fever and elevated white blood count), and since a common predisposing factor is diabetes mellitus, it seems likely that many patients with spinal epidural abscess will present with complex signs and symptoms. Spinal epidural abscess is the kind of disorder that frequently will be accompanied by severe infection elsewhere in the body and that severe infection will present its own set of signs and symptoms, so it is likely that patients with spinal epidural abscess frequently will present precisely the kind of complex situation that was presented by Jerry Baker's case. It would be anomalous to hold that the complexity of Jerry Baker's case is a reason for not diagnosing spinal epidural abscess when that complexity is likely to be typical for patients with that disorder.

In 1998 the Mackenzie study concluded:

---

[3] He also had staphylococcus aureus, but I cannot determine from the evidence whether the culture result was known before 5:37 a.m. on February 20.

The appreciable neurological recovery seen in some patients reflects the value of prompt diagnosis and early treatment. The key to successful management is early diagnosis, which requires that involved clinicians consider the diagnosis. *Repeated spinal and neurological examinations are essential in any patient with an unknown focus of infection and when there is spinal pain or tenderness full investigation is warranted*. The increasing availability of MRI may mean that earlier diagnosis and lower morbidity from this condition should become a reality in the near future.

[Emphasis added.] The opinions of plaintiffs' experts are consistent with the conclusion drawn by the authors of the Mackenzie study; the opinions of the defendant's experts are not.

In summary, I find that the VA physicians failed to exercise ordinary and reasonable care in conducting the neurological examinations on February 18, 19, and 20, 2001. I find that the VA physicians failed to exercise ordinary and reasonable care in failing to consider a compression of the cervical spine as a cause of Jerry Baker's pain in the neck, tenderness in the neck, stiffness or rigidity in the neck, weakness, and loss of sensation. I find that, if the VA physicians had conducted a neurological exam in keeping with the standard of care, and if they had included compression of the cervical spine in the differential diagnosis, they would have been led fairly quickly to the diagnosis of spinal epidural abscess. I find that, if they had included compression of the cervical spine in the differential diagnosis, the standard of care would have required them to order an MRI on an emergency basis; the MRI would have revealed the existence of the spinal epidural abscess; and the spinal epidural abscess would have been surgically removed or drained on an emergency basis. I find that the failure of the VA physicians to meet the standard of care in performing the neurological examinations and in developing an appropriate differential diagnosis proximately caused Jerry Baker's quadriparesis.

**D.    *Damages***

Tennessee law governs what damages plaintiffs may recover. 28 U.S.C. § 2674; *Molzof v.*

*United States*, 502 U.S. 301, 312, 112 S. Ct. 711, 718, 116 L. Ed. 2d 731 (1992).  Under Tennessee law, Jerry Baker is entitled to recover for the following elements of damage experienced in the past: physical pain and suffering, mental or emotional pain and suffering, loss of capacity for the enjoyment of life, and disfigurement.  TPI-Civil 14.10.  He is also entitled to recover the present cash value of physical pain and suffering, mental or emotional pain and suffering, loss of capacity for the enjoyment of life, and disfigurement reasonably certain to be experienced by him in the future.  *Id*. He is entitled to recover the reasonable and necessary expenses for medical care, services, and supplies actually given in his treatment in the past and the present cash value of medical expenses reasonably certain to be required in the future.  TPI-Civil 14.11.  He is entitled to recover for the permanency of the injuries.  TPI-Civil 14.16.  He is also entitled to recover for loss of earning capacity.  TPI-Civil 14.13.  However, in a malpractice action, economic losses are recoverable only to the extent that they "are not replaced, or indemnified in whole or in part, by insurance provided by an employer either governmental or private, by social security benefits, service benefit programs, unemployment benefits, or any other source except the assets of the claimants or of the members of the claimant's immediate family and insurance purchased in whole or in part, privately and individually."  Tenn. Code Ann. § 29-26-119.

Linda Baker is entitled to recover the following elements of damage: the reasonable value of medical care, service and supplies reasonably required and actually given in the treatment of Jerry Baker; expenses reasonably incurred in attending to him in the hospital; the reasonable value of his services that she has lost and the present cash value of such services reasonably certain to be lost in the future; and the reasonable value of his companionship and acts of love and affection that she has lost and the present cash value of such acts that she is reasonably certain to lose in the future.  TPI-

Civil 14.20.

The significant, quantifiable damage evidence came from two sources: Patricia Brown, a rehabilitation nurse, case manager, and life care planner; and Dr. Charles Venus, an economist. Ms. Brown prepared a comprehensive life care plan for Jerry Baker using cost estimates from publicly available sources. She used the Arkansas Mortality Table contained in Ark. Code Ann. § 18-2-105 to arrive at a life expectancy of 18 years. She calculated the cost of the life care plan on an annualized basis and also over a total assumed life expectancy of 18 years. That total was $2,943,510. Dr. Venus discounted Ms. Brown's calculations to present value both on an annualized basis and in total.

The principal legal issue in deciding damages is whether Tenn. Code Ann. § 29-26-119 precludes recovery of the present value of the cost of medical expenses and services reasonably certain to be incurred in the future but which Jerry Baker could obtain without cost from the VA Hospital. Neither party has cited a case from Tennessee on point, nor has the Court found one. Mr. Baker has stated that he does not wish to be treated at the VA Hospital in the future due to the traumatic experience that he had that gave rise to this case. In *Feeley v. United States*, 337 F.2d 924 (3rd Cir. 1964), the court held that a veteran who prevailed in a Federal Tort Claims Act for negligence by a VA hospital could not recover, under Pennsylvania common law, the reasonable value of services provided by the VA to him in the past. *Id*. at 933-34. However, the court held that he could recover the cost of future medical care that the VA might provide free. *Id*. at 934-35. *Feeley* is the closest case on point. Because Tenn. Code Ann. § 9-26-119 is in derogation of the common law, it must be strictly construed. *Hunter v. Ura*, 163 S.W.3d 686, 711 (Tenn. 2005). Section 29-26-119 can be read to apply only to economic losses that have been paid or are payable

at the time of trial – not to losses that are reasonably certain to become payable some time after trial. Therefore, in keeping with the Tennessee Supreme Court's holding that this statute must be strictly construed, I will predict that Tennessee would follow *Feeley* in holding that the statute would not preclude a veteran from recovering the cost of future medical expenses for services that the VA would provide without charge where the veteran proves by a preponderance of the evidence that he reasonably intends to seek his future medical care elsewhere. I find that Jerry Baker proved that he intends, if he is financially able, to obtain medical care in the future outside the VA system. I also find that it is reasonable, in light of the traumatic experience that he had at the VA hospital in Memphis, for him to have that intention. Therefore, I will not exclude from consideration the future expenses in the life care plan that would be provided without charge by the VA.[4]

Ms. Brown testified on direct examination that her report contained a mathematical error on page 8. She had reported the annual cost of Ensure, Glucema, or an alternative, to be $23,338 per year or $420,084 over 18 years. That report contains a misplaced decimal point. The projected cost of Ensure, Glucema, or an alternative, should have been $2,337.60 on an annual basis and just over $42,000 total. Correcting that misplaced decimal point reduces the annual cost of the life care plan by $21,000 and the total cost by approximately $378,000. With that exception, I find that the annual costs in the life care plan are reasonable. Dr. Adams and Dr. Rodts have experience in follow-up care with patients who have had spinal epidural abscess. They testified that the life care plan was reasonable. Ms. Brown identified the sources of the specific expenses. Those sources are reasonable. The government presented no contrary testimony.

---

[4] There was little evidence of what services the VA would provide to Mr. Baker without charge in any event.

However, I do not find that the life expectancy assumed in Ms. Brown's life care plan was proven to be reasonable.  As noted, Ms. Brown based her life expectancy on the Arkansas Mortality Table, but she stated in her report that an actuarial service should be consulted to project an adjusted/rated life expectancy.  No actuarial service was consulted.  TPI-Civil 14.53 provides:

> The life expectancy read to you is not conclusive but is an average life expectancy of persons who have reached a certain age.  You should be aware that many persons live longer, and many die sooner, than the average.  This figure may be considered by you in connection with other evidence relating to the probable life expectancy of plaintiff including evidence of the plaintiff's health, occupation, habits and other activities.

No one testified as to the probable life expectancy for a person with Mr. Baker's health, occupation, habits and other activities.  Defendant's Exhibit 7, which was introduced into evidence by stipulation, is the Narayan article entitled, *Lifetime Risk for Diabetes Mellitus in the United States*, published in the JAMA in 2003.  It estimates that, if a man is diagnosed with diabetes mellitus at age 40 years, he will lose 11.6 years in life expectancy.  Additionally, as the finder of fact, I am not required to set aside my observations and experience in the affairs of life.  8TH CIR. MANUAL OF MODEL JURY INSTRUCTIONS: CIVIL, 1.01 (2005).  My observations and experience in the affairs of life are inconsistent with the notion that a man diagnosed with diabetes mellitus in his early 40s, who has had amputations on his feet as a result of the diabetes, and who has smoked one and a half packs of cigarettes for 46 years, will have an average life expectancy.  The life care plan projects a life expectancy for Mr. Baker through 2022.  Based on the Narayan article and my own observations and experience in the affairs of life, I find that a more reasonable estimate is that someone with Jerry Baker's health, occupation, habits and other activities could be estimated to have a life expectancy through 2012.  I have calculated an estimate present value of the life care plan

using Dr. Venus's tables.  Recognizing that these calculations are estimates of numbers that cannot

be known with precision, I have reduced the present value by $20,000 for each year to account for

the mathematical error in Ms. Brown's computation.  I have also adjusted Dr. Venus's present value

calculations by one year because we are near the end of 2005.   With those adjustments, the

computation is as follows:

| Year | Calendar Year | Present Value |
|------|---------------|---------------|
| 1 | 2006 | $ 290,605 |
| 2 | 2007 | $ 127,624 |
| 3 | 2008 | $ 126,114 |
| 4 | 2009 | $ 124,158 |
| 5 | 2010 | $ 122,354 |
| 6 | 2011 | $ 122,158 |
| 7 | 2012 | $ 128,281 |
| **Total** | | $1,041,294 |

I find that a reasonable estimate of the present value of the life care plan for the remainder of Jerry

Baker's life is $1,041,294.

Plaintiffs introduced evidence of past medical expenses totaling $5,028.39.  That evidence

was received without objection.  I find that Jerry Baker's entitled to recover $5,028.39 in past

medical expenses.

Jerry Baker testified that he had worked as a bounty hunter for bail bondsmen.  He said that

in a good week he could make $1,000, and in an average week he could make $500.  However, no

tax returns or other evidence of actual income was introduced.  Jerry Baker reported that he had

applied for disability on several occasions.  He was identified in the VA Hospital records as a

disabled bounty hunter.  He reported no work history other than serving in the military and doing the

bounty hunter work.  No evidence was introduced to show that he had any job skills.  I cannot find that Jerry Baker has proven by a preponderance of the evidence that he had any real earning capacity in February 2001.  Due to his diabetes mellitus, the amputations in his feet, and his overall health condition, I do not believe that Jerry Baker was employable in February 2001, or likely to become employable but for the failure of the VA physicians to diagnose and treat the spinal epidural abscess in a timely manner.  Therefore, I award nothing for lost earning capacity.

For the physical pain and suffering, mental or emotional pain and suffering, loss of capacity for the enjoyment of life that Jerry Baker has suffered in the past and is reasonably certain to suffer in the future, and for the permanency of his injuries and disfigurement, I award $1,000,000.  There is no doubt that Jerry Baker has endured horrific suffering.  He testified, and I find, that he spends approximately 22 hours each day in bed.  He has severe pressure sores on the buttocks and has had them since 2001.  He has to sleep on his side.  Someone has to turn him every two or three hours.  He is unable to walk.  He can feed himself with his left hand and can shave with an electric razor, but otherwise he is unable to do any of the things that he would normally do.  He is totally dependent in every aspect of his life.  He is catheterized 24 hours a day and will be for the rest of his life.  He is unable to move his bowels.  Bowel movement must be precipitated digitally by his wife or someone else.  He has suffered severe depression and is reasonably certain to suffer severe depression in the future.

Another issue relates to the value of the services that have been provided to Jerry Baker from the time of his discharge from the hospital on May 26, 2001, to the present.  Linda Baker has provided care around the clock, including waking every three hours to turn him.  When she was hospitalized, she arranged for friends to take care of her husband.  Dr. Venus estimated the value of

her services as $372,006 through October 3, 2005. His calculation is based on an annual value of $85,440. That figure is taken from page 13 of Ms. Brown's life care plan wherein she estimates that the cost of an LPN/RN mix 8 hours per day, 7 days per week times 48 weeks per year (minus 18 hours or 2.25 days hospitalization allowance per year) would be $32 per hour for a total of $85,440 per year. I find that calculation to be a reasonable approximation of the value of Linda Baker's services in the past. I do so in part based on the testimony of Ms. Brown and Dr. Venus and in part on a different calculation. Linda Baker or some friend on occasion has provided care for Jerry Baker 24 hours per day, 365 days per year, which means that he has had a caregiver for 8,760 hours per year since he was discharged from the hospital. Based on my own experience in the affairs of life, I would expect that $10 per hour would be a reasonable amount to pay someone who is not a licensed professional to care for a person in Mr. Baker's condition. If so, that would amount to $87,600 per year. I will adopt Dr. Venus's calculation of $85,400 per year for a total of $372,006 through October 3, 2005. I have accepted the figure of $85,440 per year but have adjusted the multiplier from 4.354 to 4.58 to count for the fact that judgment was not entered on October 3, 2005, as Dr. Venus's calculation assume. That adjustment yields a calculation of $85,440 per year times 4.5 years equals $384,480. I find that the reasonable value of the services provided by Linda Baker and others to Jerry Baker from the date of his discharge to date is $384,480.

I find the reasonable value of the companionship and acts of love and affection that Linda Baker has lost, and the present cash value of such acts that she is reasonably certain to lose in the future, to be $250,000.

In summary, I find damages as follows:

| | |
|---|---|
| Present value of life care plan | $1,041,294 |
| Physical pain and suffering, mental or emotional pain and suffering, loss of enjoyment of life | $1,000,000 |
| Services provided by Linda Baker and others to Jerry Baker from date of discharge to present | $384,480 |
| Linda Baker's loss of companionship, acts of love and affection | $250,000 |

Judgment will be entered in the amount of $2,425,774 in favor of Jerry Baker and $250,000 in favor of Linda Baker.

IT IS SO ORDERED this  23rd  day of November, 2005.


_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE